ESTATE OF ROBERT W. HITE, SR., THE KENTUCKY TRUST COMPANY, ANNE HITE CORN, HELEN HITE SALLEE, CO-EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3404–65.    Filed March 5, 1968.

*Arthur W. Grafton*, for the petitioners.
*Meno W. Piliaris*, for the respondent.

582

Petitioners argue first that the gifts reported as having been made in 1958 and 1959 were in fact completed gifts in 1954 (or 1956 at the latest), and, therefore, these transfers do not fall within the 3-year

period specified by section 2035. Secondly, they urge that even if decedent did not make the gifts in issue until 1958 and 1959, within a period of 3 years ending with the date of his death, that the gifts were prompted by "life motives" and were not made in contemplation of death. Respondent opposes both contentions. He is aided by the statutory presumption of section 2035 itself if the transfers were made within 3 years before death, as well as by the usual presumption of correctness attaching to his determination.

## I

We must reject petitioners' first argument. Under no view of the facts developed at trial can we find a completed gift of the condemnation proceeds prior to the reported cash transfers in 1958 and 1959. Petitioners rely on the 1954 instrument reaffirming the daughters' power of attorney to show that a completed gift was made in that year. That instrument, however, only reaffirmed and explained an agency relationship with the daughters. While the explicit reason for the execution of the 1954 instrument was the prospect that the daughters would be disbursing the proceeds (or a part thereof) to themselves, if decedent was unable to write checks when the time came, the instrument does not purport to pass any interest *in praesenti* as to the proceeds. Clearly, the chose in action or claim against the State per se was not assigned. Neither was the threatened realty. It is clear also that the instrument does not even necessarily envision that the daughters would be the disbursing agents. It specifically states that in the event of decedent's inability to sign checks, the proceeds were to be distributed to his three children in an equitable way as provided by his will, by checks "either signed *by me* or my attorneys in fact." (Emphasis added.) Gifts in futuro were clearly contemplated.

The essential elements of a bona fide gift inter vivos are (1) a donor competent to make a gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift *in praesenti*; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery to the donee of the subject of the gift or of the most effective means of commanding the dominion of it; and (6) acceptance of the gift by the donee. See *Estate of Carl C. Lynch*, 35 T.C. 142, 150 (1960); *Adolph Weil*, 31 B.T.A. 899, 906 (1934), affd. 82 F. 2d 561 (C.A. 5, 1936), certiorari denied 299 U.S. 552 (1936).

It is apparent to us without an extended discussion of all the above requisites for a completed inter vivos gift that there was no donative

intent to make a present gift by means of the 1954 document. The instrument was nothing more than a statement of wishes or intentions, and at very most an explanatory document to be read together with the power of attorney granted the previous year. Additionally, we find that there was no irrevocable transfer of dominion and control. The decedent-donor reserved sufficient power over the entire transaction so that it is not even certain that the contemplated gift in futuro was an irrevocable undertaking. As mentioned, the decedent clearly envisioned that he might himself draw the checks disbursing the proceeds if he were physically able. Certainly he could revoke the power of attorney previously given to his daughters and along with this the exculpatory 1954 document.

The 1954 instrument upon which petitioners belatedly rely specifically sets forth the decedent's wish that the proceeds be distributed according to the provisions of his will. It is not disputed that wills are ambulatory in Kentucky, and taking the 1954 instrument at face value, both the amount of the gift and the individual donees were subject to change in the event of a shift in decedent's testamentary plan. In fact here decedent executed several codicils to his will after the 1954 explanatory document was signed, and there is no reason why he could not have changed his plans completely during the years between 1954 and 1961.

Petitioners urge that even if the gift was in fact revocable or for other reasons incomplete in 1954, that by 1956 it had become fixed, irrevocable and complete as to the condemnation award. It is true that in 1956 the daughters and C. T. Corn, acting in decedent's name, won the trial court judgment in the amount of $91,022.50 and that they, in decedent's name, could have "drawn down" the trial court's award at that time, and then Helen and Anne, acting as attorneys in fact for their father could have transferred the funds to the ultimate recipients. Usually, acceptance of a substantial gift is presumed unless the contrary be shown. Here, however, not only was there no acceptance, but acceptance of the gift in 1956 was patently rejected when the putative donees did not draw down the award and distribute same, but instead elected to leave it in court and appeal the decision. It is not disputed that on appeal the award could have been either decreased or increased. As it happened, decedent's appeal was successfully settled and the total amount received from the State several years later amounted to $126,000.

At least as important to our decision as the donees' rejection of the putative gift in 1956 is the continuing revocable nature of the whole arrangement, particularly with respect to the quantity of the gift and the number and identity of the recipients. Decedent's original intention as expressed in the 1954 instrument was that his three children

would share in the proportion dictated by his will. Petitioners have urged throughout the trial and on brief that it is this 1954 instrument which sets the tenor of the entire transaction. Yet, in 1958, when the first moneys from the State were finally received, the distribution was not strictly in accord with the 1954 instrument. Donees not mentioned anywhere in decedent's will as primary beneficiaries or at all in the 1954 instrument were included in addition to the three children. The added donees were Maurice Hite Henchey and C. T. Corn, decedent's grandson and son-in-law, respectively. The flexibility of the plan of distribution at all times until the payment had been received and its apportionment had become a fait accompli dictates and reinforces our conclusion that even in 1956 there was no completed gift.

Petitioners' own evidence and urgings have convinced us that decedent was a pleasant, cheerful, and relatively alert old gentleman, even though his speech was affected and he was chronically ill with heart and circulatory ailments and other infirmities of old age. It has not been proven to our satisfaction that he could not at any time have changed the whole scheme of the condemnation distribution, either by altering his will, by revoking the previously granted powers of attorney or by simply directing that the proceeds be distributed by some other formula, or to other recipients or not at all. Apparently the decedent did direct or give his assent to a distribution by some other formula, as his attorneys in fact made gifts as indicated not in strict accord with his testamentary plan. We would also note in passing that in August of 1956 decedent was sufficiently in possession of his faculties to have executed and signed personally a fifth codicil to his will in which he named substitute beneficiaries who would take in the event he was predeceased by his daughters. We conclude and hold that the gifts or transfers in question did not occur until a portion of the condemnation proceeds were actually transferred in 1958 and 1959 as was reported for gift tax purposes, and as was also reported in the estate tax return filed by these petitioners.

In closing our discussion of petitioners' first argument, we would point out finally that it was decedent who reported the transaction and paid the capital gains and gift taxes upon receipt of the proceeds from the State and the concomitant distribution to his loved ones. The returns involving the condemnation proceeds were filed for the years 1958 and 1959, and not for any earlier years. If the three children received any present interest prior to that time, why did one of them not file a gift tax return reporting the gifts made in 1958 to Maurice Hite Henchey, the decedent's grandson, and C. T. Corn, his son-in-law? The gifts to Maurice and C. T. Corn were reported on decedent's 1958 gift tax return. This fact undercuts all of petitioners' contentions that the variation from the distribution envisioned in the 1954 instrument

merely demonstrates the extent to which the children had been exercising dominion and control over the right to the proceeds. We conclude and hold that no gifts occurred with respect to the condemnation proceeds until 1958 and 1959, when transfers of various portions of available cash therefrom were made.

*II*

The cash gifts in 1958 and 1959 occurred within 3 years of the date of death, and respondent has invoked section 2035, I.R.C. 1954, in order to include the amount of these gifts in decedent's gross estate.[4] We must make the essentially factual determination of whether life or death motives were controlling, impelling, or dominant. *Allen* v. *Trust Co. of Georgia*, 326 U.S. 630, 636 (1946).

The Supreme Court in *United States* v. *Wells*, 283 U.S. 102 (1931), has set forth the classic definitional statement on the meaning of the statutory phrase, "in contemplation of death." It is incumbent upon us to ascertain the dominant motive prompting the gift. The purpose of the statute and its predecessors is to reach substitutes for *testamentary* dispositions in order to prevent evasion of the estate tax. Here the documentary and other objective evidence demonstrates conclusively to us that the inter vivos gifts, quite literally, were testamentary substitutes.

We conclude that the objective evidence establishes that the 1958 and 1959 gifts were a part of decedent's overall testamentary scheme and that the transfers were not made for any life motive. In our judgment, the usual surrounding circumstances so frequently resorted to in an effort to ascertain indirectly a decedent's subjective motives are entitled to less weight when the questioned gifts can be shown by objective evidence to have been testamentary substitutes. The question of testamentary substitute *vel non* is what the statutory phrase, "in contemplation of death," is "all about." *United States* v. *Wells, supra,* and *Allen* v. *Trust Co. of Georgia, supra.*

---

[4] SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

(b) APPLICATION OF GENERAL RULE.—If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment) ; but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.

As it happens, here, in addition to the objective evidence, the accepted indicia also generally support our conclusion that the 1958 and 1959 gifts were in contemplation of death. A handy compilation of the more frequently relied upon of these guides is found in *Estate of Oliver Johnson*, 10 T.C. 680, 688 (1948). We need not repeat them all here.

However, in passing, we observe that decedent was a very old man when he made the questioned gifts and was in chronic ill health. He was well aware of his recurring and continuing illnesses even though he was cheerful and hoped to see the age of 100. The amount of his property transferred in proportion to the amount of property retained was quite large and it was transferred in accordance with his testamentary plan. There was no long-established gift-making policy on the part of decedent. He made no substantial gifts prior to 1953 when he suddenly at age 84, after a serious stroke and several subsequent hospitalizations, commenced making substantial gifts as he liquidated various of his real estate holdings.

Petitioners urge that the initial 1952 sale and corresponding 1953 distributions were entered into primarily to aid his financially embarrassed and recently widowed daughter, Helen. However, the total amount given was split equally among all three children, and under the facts, we are not moved to conclude that there was an "equalizing motive," so as to remove any taint from the initial 1953 gifts. See *Estate of Carl C. Lynch*, 35 T.C. 142, 151 (1960). No gifts were made prior to the simultaneous distribution in 1953 to suggest an "equalizing situation." As for Helen, she had been a widow for 2 years before the alleged rescue from her plight and only 5 months after receipt of her share she was remarried and out of financial need.

The 1954 and 1955 gifts were said to have been the more or less natural consequence of the 1953 and 1955 sales of land which were purportedly entered into to establish value in the area because of the threatened condemnation. The negotiations and proceedings with the State were known to be in the offing. As we noted in our Findings of Fact, however, the 1954 gifts were of a much greater amount than the "corresponding" proceeds of the 1953 sale. Of course, these 1953, 1954, and 1955 gifts are not directly in issue, but on brief the parties have submitted arguments which relate to them as part of the general scheme of distribution. Finally we must reject petitioners' argument that all the transfers were made by decedent so that he could enjoy seeing his children enjoy the proceeds during his lifetime. This somewhat usual and hackneyed argument is not convincing, nor does the rather general, vague, and scanty evidence of record support the

assertions. We doubt that at his age and in his condition, as disclosed by the record, decedent was aware at all of whether or not the transfers acted to brighten the donees' lives.

Finally we note again that the donees of all the gifts were the natural objects of decedent's bounty and except with very minor differences the designated beneficiaries under his will. This last indicator, as well as the others mentioned, is, of course, closely related to the central fact, i.e., integration of the gifts into the testamentary scheme.

Taken as a whole, the entire record clearly establishes that the 1958 and 1959 gifts were made in contemplation of death. Not only does the evidence fail to establish a life motive for the transfers so as to overcome the statutory presumption and the presumption of correctness attaching to the respondent's determination, but on the contrary it establishes a dominant motive and plan to strip down decedent's estate as fast as and whenever possible by transferring all assets after liquidation thereof when a ready division became feasible, in accordance with the decedent's general testamentary plan and scheme. The burden of proving that the thought of death was not the dominant motive in making the transfers has proved too heavy for petitioners to bear. They have failed utterly to meet it, and, accordingly, we sustain respondent's determination.

*Decision will be entered for the respondent.*