JOHN J. PATCH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Patch v. Commissioner
Docket No. 1217-77.
United States Tax Court
T.C. Memo 1980-11; 1980 Tax Ct. Memo LEXIS 572; 39 T.C.M. (CCH) 880; T.C.M. (RIA) 80011; January 17, 1980, Filed John J. Patch, pro se. Matthew W. Stanley, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a $1,851.13 deficiency in petitioner's income tax for 1974. The issues for decision are: 1. Whether petitioner is entitled to a dependency exemption for his father. 2. Whether petitioner is entitled to deduct certain medical expenses related to the care of his father. 3. Whether petitioner is entitled to deduct certain legal expenses. 4. Whether petitioner is entitled to deduct charitable contributions in excess of the amounts allowed by respondent. 5. Whether petitioner is entitled to attorney's fees. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time he filed his petition, John J. Patch was a resident of Anchorage, Alaska. Petitioner is a licensed attorney and is admitted to practice *574 in the states of Florida and West Virginia. Dependency Exemption and Medical Deduction
Prior to August 1973 petitioner's father, John E. Patch ("John, Sr."), suffered two strokes. He was confined to a wheelchair and suffered a speech impediment as a result of the second stroke. In August 1973 petitioner's mother died. Thereafter petitioner's younger sister and her husband lived with John, Sr.
Shortly after his mother's funeral, petitioner and his two sisters began discussing with their father the possibility of transferring his assets to them. Three concerns promoted these discussions: (1) their father's fragile state of health and the potential inability to liquidate his assets to pay for medical expenses; (2) the younger sister's need for a place to live; and (3) petitioner's desire to insure that at sometime in the future some member of the family would be able to claim the father as a dependent for tax purposes. John, Sr., executed certain documents in order to deal with these concerns. Among these were a deed conveying the house in Masontown to his younger daughter and a general power of attorney naming petitioner as his attorney-in-fact. John, Sr., signed the *575 power of attorney on August 31, 1973, in Masontown, Pennsylvania. It empowered petitioner "to act in, manage, and conduct all my estate and all my affairs, in the respects hereafter mentioned, and for that purpose for me and in my name, place and stead, and for my use and benefit * * *." Besides enumerating sixteen specific powers, the document's final clause gave petitioner the general power "to do and perform all and every act * * * as I might do or could do in my own proper person * * *." From January 1974 until sometime in May of that year John, Sr., lived with his younger daughter in Masontown, Pennsylvania. The daughter became pregnant in May and was no longer able to care for her father. Consequently, he moved to a nursing home and remained there for the rest of 1974. John, Sr., received social security payments of $2,611.20 and pension payments of $1,359.84 in 1974. [1] During 1974 he and his younger daughter maintained a joint checking account in a bank in Masontown, [2] and the daughter deposited both his social security checks and his pension checks into this account. Funds from this account were used to pay John, Sr.'s expenses during 1974. These expenses included *576 a total of $6,186.76 spent on insurance, doctors, therapists, and the nursing home. At the time John, Sr., entered the nursing home, petitioner realized that his father's social security and pension checks were not sufficient to cover the cost of the nursing home and his medical expenses. Between June and November 1974 petitioner deposited $2,900 into John, Sr.'s joint checking account to help defray these expenses. Petitioner spent an additional $200 for meals and other support items for his father during 1974. In February 1976, after the Internal Revenue Service began auditing petitioner's 1974 tax return, John, Sr., wrote the following letter to the District Director in Anchorage: Dear Sir: This letter is to inform you that on 31 August 1973 I issued a general power of attorney to my daughter, Jo Ellen Rawlings and my son, John J. Patch. It was my intention on that *577 date to assign my pension income equally to my daughter, Jo Ellen Rawlings and my son, John J. Patch for the years 1973, 1974 and all future years. [3] I do not claim receipt of the pension income constructively or in any other way. I realize my support is being provided primarily by my son and the purpose of the assignment and powers of attorney was to assure he could claim me as a deduction on his 1974 return and for future years, if necessary. It is my present belief that no pension income is being received by me and none has been received since 31 August 1973. If you desire any further information or desire other documentation, please contact me at your convenience. Neither petitioner nor his father ever inquired whether the pension rights were assignable, nor did they notify the trustees of the pension plan of any assignment. On June 26, 1978, petitioner drafted a "Deed and Instrument of Gift and Rtification and Reaffirmation of Prior Gift." In this document petitioner, acting on behalf *578 of his father and pursuant to the power of attorney, reaffirmed and ratified the giving of the pension income equally to himself and his younger sister as of August 31, 1973. On his 1974 return petitioner claimed a dependency exemption for his father and $3,000 in medical expenses relating to his father's stay in the nursing home. Both the exemption and the medical expens deduction were disallowed by respondent. Legal Expenses
In 1972 petitioner worked as an attorney for the Corps of Engineers in Galveston, Texas. During that year petitioner lost his job because of a reduction in staff. Consequently, he applied for and received unemployment compensation from the state of Texas. Later in 1972 petitioner obtained employment as a title examiner with the Houston branch of the Chicago Title Company. He remained there until December 1972 when he became employed by the Department of the Army and moved to Waukeegan, Illinois. In June 1974 the State of Texas filed criminal charges against petitioner alleging that he made false statements in his 1972 unemployment compensation application. Prior to the filing of these charges, the Army offered him a promotion and a transfer *579 to Alaska. The Army, however, indefinitely postponed petitioner's promotion pending a favorable disposition of this case. [4] Petitioner retained local counsel in Texas and went to Texas several times to make court appearances. On December 4, 1974, the court dismissed the case with prejudice and, subsequently, petitioner received his promotion. On his 1974 return petitioner deducted $3,600 as a business expense relating to this legal matter. Of this amount, $3,000 represented attorney fees and $600 represented the cost of his court appearances during the proceedings. Respondent determined that the entire $3,600 was personal in nature and disallowed the deduction. Charitable Contributions
Petitioner claimed the following charitable contributions on his 1974 income tax return: Salvation Army $430
Catholic Church
150
Boy Scouts
Girl Scouts
75
Salvation Army
March of Dimes
The *580 contributions to the Catholic Church and the miscellaneous organizations were made in cash and no records were maintained. In December 1974 petitioner gave clothing to the Salvation Army Center of Waukeegan, Illinois. This clothing was less than three years old and included 12 pairs of trousers, 3 suits, 2 all-weather coats, 2 shirts, 1 pair of cowboy boots and 2 pairs of shoes. Petitioner claimed a deduction of $430 for these items based on an original cost value of $710 less $280 in depreciation. Respondent determined that the fair market value of the clothing donated to the Salvation Army was $172. Respondent conceded the deductibility of the $150 cash contribution to the Catholic Churs but disallowed the remaining charitable deductions for lack of substantiation. OPINION Dependency Exemption and Medical Deduction
The first two issues are whether petitioner is entitled to a dependency exemption for his father ("John, Sr.") for 1974 and whether petitioner is entitled to deduct $3,000 in medical expenses incurred on behalf of his father during that year. Petitioner was entitled in 1974 to a dependency deduction of $750 [5] "for each dependent (as defined in section *581 152 [6])" whose gross income for the calendar year is less than $750. Sec. 151(e)(1). Petitioner's father is his dependent, within the meaning of section 151, only if petitioner provided more than half of his father's support in 1974. Petitioner may deduct his father's medical expenses (in excess of the 3% adjusted gross income floor) in 1974 only if his father was his dependent (as defined in section 152) in 1974. Therefore we must decide whether petitioner provided over half of his father's support in 1974. As part of his burden, petitioner must establish by competent evidence the total amount of his father's support from all sources during the taxable year. See Stafford v. Commissioner, 46 T.C. 515, 518 (1966). Such amount, however, need not be established with absolute precision. See Pillis v. Commissioner, 47 T.C. 707 (1967), affd. 390 F. 2d 659 (4th Cir. 1968), cert. *582 denied 393 U.S. 883 (1968); Cobb v. Commissioner, 28 T.C. 595, 597 (1957). For purposes of section 152, support includes "food, shelter, clothing, medical and dental care, education and the like." Sec. 1.152-1(a)(2)(i), Income tax Regs. It is petitioner's contention that the general power of attorney executed by John, Sr., on August 31, 1973, was an effective gift instrument transferring to him all of his father's rights in the pension plan. Petitioner claims that as a result of the alleged gift, the $1,359.84 annual pension was his to do with as he pleased. Accordingly, he argues that the $1,359.84 should be added to his other contributions of $3,100 in determining whether he provided over one-half of John, Sr.'s support. [7] on the other hand, respondent contends that no gift occurred and that petitioner's contributions did not exceed $3,100. It has been stipulated that *583 $6,186.76 was the cost of John, Sr.'s stay in the nursing home from May 1974 until the year's end and his medical and insurance costs for the entire year. There was no additional evidence introduced at trial to aid us in computing John, Sr.'s total support for the year. To arrive at such a figure, we must, at a minimum, add to the $6,186.76 the cost of food and shelter for the period January to May when John, Sr., resided with petitioner's younger sister and the amounts spent on John, Sr.'s clothing for the entire year. If the pension payments are excluded from the amount of support attributed to petitioner his $3,100 in contributions does not constitute more than one-half of his father's support, because the total figure clearly exceeded $6,200 in 1974. Therefore, inclusion of the pension payments in petitioner's contribution to his father's support is crucial to his position and petitioner does not argue the contrary. Furthermore, if we assume that every dollar contributed by petitioner were applied to his father's support and if we assume that every dollar of the pension and social security payments were similarly applied, then John, Sr., provided more of his own support *584 than petitioner did unless the pension payments are attributed to petitioner. Without including the pension payments in petitioner's contributions, petitioner provided $3,100 in support of his after while the total of the pension and the social security payments was $3,971.04. [8]
The general power of attorney on which petitioner relies to establish the "gift" of the pension rights does nothing of the kind, as petitioner, an attorney, could scarcely be unaware. A general power of attorney creates an agency relationship, conferring on the agent or attorney-in-fact the authority to manage the affairs of his principal. See Lesavoy Industries, Inc. v. Pennsylvania General Paper Corp., 404 Pa. 161, 171 A. 2d 148, 150-151 (1961); 3 Am. Jur. 2d 433 (1962). As in other agency relationships, the agent preforms his acts on behalf of, and for the benefit of, the principal and does not act in his own name. Id.On its face, the general power of attorney executed by John, Sr., on August 31, 1973, appears *585 to be a conventional power of attorney. It does not transfer ownership of property to petitioner but rather merely empowers petitioner "to act in, manage, and conduct all my estate and all my affairs * * * for me and in my name, place and stead, and for my use and benefit * * *." (Emphasis supplied.) This language does not create a present gift of anything. In fact, it precludes any such contention. Not only does the language of the general power of attorney negate any inference that a gift was made, but the action of the alleged donor demonstrate that no gift took place. After the power of attorney was executed the monthly pension checks continued to be mailed directly to John, Sr., at his residence in Masontown, Pennsylvania. The checks were then deposited into John, Sr.'s checking account from which they were expended. At no time from the mailing of the checks, to their deposit in the bank, ot their disbursement, did petitioner ever enter the picture. The pension plan was never notified of any change in the ownership of the pension rights nor did petitioner or his father ever inquire whether such pension rights were even assignable.The bank account into which the checks *586 were deposited was a joint account shared by John, Sr., and petitioner's younger sister; petitioner had no access to the account and, consequently, no access to the funds therein. In order for petitioner to exercise any ownership rights over the pension checks he would have to have asked John, Sr., or his sister to withdraw the funds from the bank. [9]
Petitioner attempts to rebut the overwhelming evidence contradicting that a gift was made by saying that it fact his father never exercised any dominion and control over the pension rights or the checks subsequent to the execution of the power of attorney. But as indicated above, the facts belie this assertion; the checks were mailed to John, Sr., made payable to John, Sr., deposited in John, Sr.'s bank account, and expended from such account for the support of John, Sr.Moreover, petitioner fails to recognize that the ultimate dominion and control was firmly in John, Sr.'s hands, namely, the ability to revoke the power of *587 attorney. See Hartley's Appeal, 53 Pa. 212 (1866); 3 Am. Jur. 2d 442 (1968) ("A power of attorney constituting a mere agency, as when it concerns the interest of the principal alone, may be revoked at any time, with or without cause.) It was, therefore, possible for John, Sr., to rescind petitioner's ability to deal at all with the pension rights. Petitioner, however, relies on the letter written by his father to the Internal Revenue Service in 1976 in which his father indicated that it was his intention and belief that the power of attorney embodied an effective gift instrument. Petitioner contends that this ledger could recoractively perfect an otherwise ineffective gift. However, the events preceding the letter cannot be ignored. The appearance of the letter in 1976 cannot alter the fact that during 1974 the pension checks were mailed to John, Sr., made payable to John, Sr., deposited in John, Sr.'s bank account, and expended from such account for the support of John, Sr. These events are clearly inconsistent with the notion that the power of attorney effected by present delivery of property rights. Thus, no gift of the pension rights occurred in 1973 even *588 if we accept the father's belated recharacterization of his intent. Consequently, we attribute the pension payments to John, Sr., for purposes of the support test under section 152(a). [10] We, therefore, conclude that petitioner contributed less than one-half of his father's support in 1974. Accordingly, petitioner's father was not his dependent (as defined in section 152) in 1974, and petitioner is not entitled either to a dependency exemption for his father or to a medical expense deduction for his father's medical expenses in 1974. *589 Legal Expenses
In 1974 petitioner paid legal fees and related expenses of $3,600 in connection with with a criminal proceeding. Petitioner claims these expenses are deductible under section 162. Respondent, on the other hand, contends that these legal expenses were a nondeductible personal expense, and we agree. In United States v. Gilmore, 372 U.S. 39, 49 (1963), the Supreme Court held that the deductibility of legal expenses is determined by the "origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer * * *." In this case, the origin of the claim from which the legal costs arose--criminal charges for false statements made in the application for state unemployment--was clearly personal, even if a conviction might have been detrimental to petitioner's career as an attorney or to his pending promotion and transfer. Petitioner cannot argue that the criminal proceeding originated in his activities as an attorney since it was related to his unemployment and not his employment. It is the absence of this nexus between his employment activities and the legal proceedings *590 which distinguishes petitioner's case from those which he cites in support of his position. Compare Tellier v. Commissioner, 383 U.S. 687 (1966) (criminal proceeding against security dealer for violations of the Securities Act of 1933); Howard v. Commissioner, 16 T.C. 157 (1951), affd. 202 F. 2d 28 (9th Cir. 1953) (court martial proceeding against Army officer); Kaufman v. Commissioner, 12 T.C. 1114 (1949) (criminal proceeding against attorney arising from his representation of a client). While we do not doubt that petitioner's defense of the criminal charges was necessary to protect his promotion, his employment and his license, these consequences alone do not suffice to transform an otherwise personal expense into a deductible one. See, e.g., Teller v. Commissioner, supra; Nadiak v. Commissioner, 356 F. 2d 911 (2d Cir. 1966), affg. a Memorandum Opinion of this Court; Rafter v. commissioner, 60 T.C. 1, 10 (1973), affd. 489 F. 2d 752 (2d Cir. 1974), cert. denied 419 U.S. 826 (1974). Charitable Contributions
Petitioner claimed numerous charitable *591 contribution deductions on his return. Respondent disputes the substantiation of petitioner's $75 cash charitable contributions to miscellaneous organizations and $430the value petitioner placed on his used clothing which he donated to the Salvation Army. The burden is on petitioner to substantiate by good and sufficient evidence his claimed deduction. Welch v. Helvering, 290 U.S. 111 (1933). Petitioner has not introduced any evidence to substantiate the claimed cash contributions to the miscellaneous organizations and, consequently, that deduction is disallowed. [11] However, with respect to the used clothes donated to the Salvation Army, bearing in mind their cost and age, we find that the evidence supports a deduction of $250 rather than the $172 allowed by respondent. Attorhey's Fees
The final issue in this case is whether petitioner is entitled to attorney's *592 fees. Petitioner's request is denied because this Court lacks the jurisdiction to award attorney's fees. See Key Buick Co. v. Commissioner, 68 T.C. 178 (1977), on appeal (5th Cir., August 15, 1977). Decision will be entered under Rule 155. Footnotes
1. John, Sr., received these checks as a beneficiary of a non-contributory pension plan. The checks were made payable to John E. Patch and were mailed to his home in Masontown, Pennsylvania. ↩
2. Respondent does not contend that the daughter's own funds were commingled with her father's in the account.↩
3. Although the letter indicates that both petitioner and his younger sister were issued powers of attorney, the August 31st document refers only to petitioner.↩
4. Petitioner believed that not only was his promotion riding on the case's outcome but so was his job and career as an attorney. This belief was based on his assumption that a criminal conviction would cause him to be either permanently or temporarily disbarred.↩
5. The amount has been subsequently changed to $1,000. Sec. 151(e)(1)(A), as amended by sec. 102(a), Revenue Act of 1978, 92 Stat. 2763. ↩
6. All statutory references are to the Intervenal Revenue Code of 1954, as in effect during the year in issues.↩
7. Petitioner argues that it was only at his direction that the pension checks were deposited into his father's account and expended for his father's support. It is petitioner's contention that the pension checks were never actually nor constructively received by his father.↩
8. Although social security payments are not includible in gross income, they are included in the computation of total support. Sec. 1.152-01(a) (2) (ii), Income Tax Regs.↩
9. Moreover, if a gift were intended and actually occurred in 1973 John, Sr., may have been required to file a gift tax return in that year. Sec. 6019. There is no evidence of any such return being field.↩
10. Our conclusion as to the ineffectiveness of the power of attorney as a gift instrument is consistent with the prior holding of this Court in Hite v. Commissioner, 49 T.C. 580 (1968). Although the facts in Hite↩ were different and federal tax law, rather than state law was applied, we held that the taxpayer could not rely on a previously executed general power of attorney to back date the gift of a condemnation award so as to escape the grasp of sections 2035, Transactions in Contemplation of Death. The plain meaning of the power of attorney coupled with the failure to explicitly assign either the condemnation proceeds or the underlying realty warranted the conclusion that neither the donative litent for the delivery requirements of a gift had been satisfied.
11. Petitioner merely testified that the deductions reflected his general recollection of cash dropped into Salvation Army kettles, cash paid for Boy and Girl Scout candies and the like. Petitioner did not, however, provide any details as to how he arrived at the amount of these deductions.↩